# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Crozer Chester Medical Center, : 
                        Petitioner :
                                   :
        v.                         : No. 648 C.D. 2018
                                   : Argued: March 12, 2019
Bureau of Workers' Compensation    :
Fee Review Hearing Office (Laundry  :
Owners' Mutual Liability Insurance), :
                        Respondent :

BEFORE:    HONORABLE ROBERT SIMPSON, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**                    **FILED: April 3, 2019**

This case involves an appeal under the trauma center exemption from the medical fee caps in the cost containment provisions of the Workers' Compensation Act (Act).[1] The Crozer Chester Medical Center (Provider) petitions for review of an order of Workers' Compensation Fee Review Hearing Officer Thomas Kuzma (Hearing Officer) that vacated an administrative determination by the Bureau of Workers' Compensation's Medical Fee Review Section (Bureau), concluding that Provider was entitled to $84,659.54 under the trauma center exemption for medical services provided to David Parker (Claimant). In vacating the Bureau's fee review determination, Hearing Officer determined Claimant did not suffer an immediately life-threatening or urgent injury. Therefore, Hearing Officer

---

[1] Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §§1-1041.1, 2501-2710.

ruled that Provider was not entitled to any more than the $12,402.46 already tendered by Laundry Owners' Mutual Liability Insurance (Insurer).

Provider contends Hearing Officer erred in vacating the Bureau's fee review decision and by determining that Provider's services did not qualify as trauma services for purposes of the trauma center exemption. For the reasons that follow, we are constrained to affirm.

## I. Background

In his decision, Hearing Officer noted that the central issue in Provider's appeal was whether the treatment provided to Claimant was for an immediately life-threatening or urgent injury, such that Provider is entitled to reimbursement at 100% of the usual and customary charges, and not limited by the medical fee caps. See Section 306(f.1)(10) of the Act, 77 P.S. §531(10) (provider entitled to its usual and customary charge for acute care in an acute care facility, accredited as a Level I or Level II trauma center, of a patient with immediately life-threatening or urgent injury).

### A. Claimant's Work Injury

Hearing Officer found the following facts. On January 22, 2016, Claimant suffered work-related injuries when he started a farm tractor that he did not know was in gear. The tractor pushed him to the ground and ran over his right foot. Emergency Medical Services (EMS) personnel arrived at the scene and made the following triage assessment: (a) Claimant's chief complaint was right-foot fracture, confirmed when EMS removed Claimant's boot, Claimant had a good pulse

2

and motor sensation; (b) Claimant also complained of right-arm pain, he denied head, neck, or back pain; (c) Claimant remained alert, he did not lose consciousness, he gave verbal consent for transport; (d) Claimant's Glasgow Coma Scale was 15 (alert, responsive);[2] (e) Claimant's airway was patent and respiration was normal; (f) Claimant's cardiovascular, neurological and mental status assessments were normal; (g) Claimant's pelvis was stable to flexion/compression; and (h) Claimant's head, neck and chest were unremarkable, his abdomen was non-tender and no abnormalities of the back were detected.

EMS transported Claimant, without lights or sirens, from the accident scene to Provider even though another hospital was closer. Upon arrival, Claimant was awake and oriented. He answered questions. Claimant's admitting physician, Dr. Mohammed H. Budier, noted Claimant's chief complaints were pain in the right foot, right groin and right side of his chest. Vital signs were normal. Claimant had tenderness as to the right ribs, superficial abrasions, tenderness of the right pelvis, and a deformity of the right foot, with normal vascular exam, movement and sensation. Subsequent diagnostic tests were ordered.

Claimant's chest X-ray read as normal. Computerized tomography (CT) scans of Claimant's head and cervical spine were negative. A FAST (focused assessment with sonography in trauma) exam showed no signs of internal abdominal or pelvic hemorrhage. However, a CT scan of Claimant's pelvis showed a fracture

---

[2] The Glasgow Coma Scale measures a patient's level of consciousness. See Reproduced Record (R.R.) at 41a. A Glasgow Coma Scale of less than 14 requires transport to a trauma center under Step One of the American College of Surgeons' (ACS) Field Triage Guidelines. R.R. at 39a.

of the superior pubic ramus of the pelvis. An X-ray of Claimant's right foot/ankle revealed a homolateral Lisfranc fracture/dislocation and an oblique fracture through the second metatarsal shaft.

Provider's Orthopedics Department (Orthopedics) also evaluated Claimant. It noted Claimant's metatarsal shafts were tenting the skin with blanching of the skin. Orthopedics expressed concern regarding neurological skin compromise. The same day, Dr. Evan Bash, an orthopedic surgeon, performed emergency surgery in the nature of an open reduction internal fixation of the Lisfranc fracture/dislocation and second metatarsal shaft fracture.

Claimant's superior pubic ramus fracture did not require surgical intervention. Provider discharged Claimant two days later with post-discharge instructions to follow up with Orthopedics for hardware removal. The record did not indicate that Claimant needed follow-up treatment for the superior pubic ramus fracture.

### B. Provider's Charges; Fee Review Determination

In March 2016, Provider billed Insurer $97,062 for the treatment it rendered Claimant from January 22 through 24, 2016. Provider stamped the bill as "trauma." See Reproduced Record (R.R.) at 3a-4a. In response, Insurer issued Provider an Explanation of Reimbursement indicating the diagnosis related group amount due Provider as $12,402.46. Insurer reasoned that the medical fee caps limited what Provider could charge.

4

In April 2016, Provider filed a timely application for fee review under Section 306(f.1) of the Act, 77 P.S. §531, challenging Insurer's payment. In its response to a request for information from the Bureau, Insurer stated that the ambulance record showed no lights or sirens were used and Claimant remained awake and communicating. Claimant reported only an injury to his foot, and he did not lose consciousness.

In July 2016, the Bureau circulated its fee review determination. The Bureau determined Insurer owed Provider $84,659.54, plus interest. The Bureau further determined Provider's documentation met the guidelines outlined in Section 127.128 of the Workers' Compensation Medical Cost Containment Regulations (MCC Regulations), 34 Pa. Code §127.128. Therefore, the Bureau concluded Provider was entitled to reimbursement at 100% of the usual and customary charges/rates.

## C. Hearing Officer's Decision

Insurer filed an appeal in the nature of a Request for Hearing to Contest Fee Review Determination. R.R. at 15a-16a. In the proceeding before Hearing Officer, Insurer submitted into evidence several Bureau documents setting forth the procedural history of the case, the EMS records, a report from Dr. John Curtis (Insurer's Physician), a full-time emergency room (ER) physician in New England, an independent medical evaluation (IME) report from Dr. Steven Boc (IME Physician), and a copy of the applicable American College of Surgeons' (ACS) Field Triage Guidelines (Triage Guidelines), dated 2011.

In opposition to Insurer's appeal, Provider submitted, among other items, two reports from Dr. Wassim Habre (Provider's Physician), a trauma and critical care surgeon employed by Provider. He is board certified in general and critical care surgery.

Hearing Officer found Insurer's Physician's report and testimony to be credible and persuasive, with the exception of his speculation that EMS transported Claimant to Provider because it was the closest hospital. Hr'g Officer's Op., 4/9/18, Finding of Fact (F.F.) No. 25. Hearing Officer found Insurer's Physician well qualified to discuss the issues in Provider's appeal. Id. Hearing Officer also found that the evidence supported Insurer's Physician's report and testimony. Id.

Insurer's Physician is a full-time ER physician at two hospitals in New England that carry a trauma designation. He is board certified, but not in Pennsylvania, in emergency medicine and medical toxicology. F.F. No. 21a. Insurer's Physician performed a review on Insurer's behalf and authored a February 2017 report. F.F. No. 21b. He reviewed the EMS records, Provider's medical records, and the 2011 Triage Guidelines. Id. Insurer's Physician also reviewed IME Physician's report and Provider's Physician's first report. Id.

Insurer's Physician made the following statements. There is no indication in the EMS records that EMS personnel concluded that Claimant needed to be taken to a trauma facility. F.F. No. 21c. Claimant did not meet the Triage Guidelines for a trauma center referral from the field. F.F. No. 21d. There is nothing in the ER intake records indicating Claimant faced an immediately life-threatening

6

or urgent injury based upon the Triage Guidelines. F.F. No. 21e. Although Orthopedics expressed concern about a neurovascular skin compromise, neither the EMS records nor the ER intake records indicate that a neurovascular compromise occurred. Id. To the contrary, the location of the injury (right foot) and normal pulses noted before and after Claimant's surgery indicated that a neurovascular compromise would not be expected. Id.

Claimant's fracture was not a life-threatening or urgent injury based on the Triage Guidelines. F.F. No. 21f. Although surgical referral and reduction is necessary to prevent arthritis and chronic pain, a Lisfranc fracture is not a limb-threatening injury and commonly presents to non-trauma centers for management. Id.

Further, a superior pubic ramus fracture is a relatively common and non-surgical injury. F.F. No. 21g. Such a fracture does not fit the Step Two ACS triage category of a pelvis fracture. Id. Here, Claimant did not complain of pain to the pelvis or abdomen. Id. EMS noted that Claimant's pelvis was stable to flexion/compression. Id. As such, there was no clinically apparent pelvis fracture, and no concern about pelvis stability. Id. Rather, Claimant's pubic ramus fracture was discovered only after a CT scan. Id.

Insurer's Physician also stated that Claimant's right-foot injury was not a crush injury as referenced in Step Two of the Triage Guidelines. F.F. No. 21h. The external exams did not note any bruising, laceration, or any real evidence that

Claimant's right-foot injury was the result of a crush.  Id.  The fracture/dislocation could easily have occurred when the tractor pushed Claimant to the ground.  Id.

Insurer's Physician also disputed Provider's Physician's initial report on several grounds.  F.F. No. 21j.  Provider's Physician described the mechanism of injury as a tractor running over the right side of Claimant's body.  Id.  However, Claimant never indicated to EMS or ER personnel that the tractor ran over anything more than Claimant's right foot.  Id.  In addition, the clinical findings do not support a belief that the tractor ran over the right side of Claimant's body.  Id.

Insurer's Physician also noted that Provider's Physician incorrectly stated that EMS personnel activated a Level II trauma alert upon arrival at Provider at 11:40 a.m.  Id.  Insurer's Physician also opined that Provider's Physician improperly relied upon a study published in a medical journal to indicate that an impending neurovascular compromise is a potential limb-threatening injury.  Id. The study was a small study involving seven patients; none of them had Lisfranc injuries.  Id.

Insurer's Physician also disputed Provider's Physician's suggestion that Claimant, 41 years old, is at an age where pelvic fractures are almost always associated with severe trauma requiring massive force, such as motorcycle crashes or crush injuries.  Id.  To the contrary, the EMS and ER records do not indicate that Claimant suffered external trauma.  Id.

Insurer's Physician also disagreed with Provider's Physician's statement that although Claimant's pelvic injury did not require surgical intervention, it would require long-term rehabilitation and pain management. Id. Insurer's Physician pointed out there is nothing in the record indicating Claimant requires long-term rehabilitation and pain management because of his superior pubic ramus fracture. Id.

Hearing Officer also credited IME Physician's report with respect to its conclusion that the records IME Physician reviewed, in conjunction with his December 2016 IME of Claimant's work injury, showed no evidence of compartment syndrome or neurovascular structural damage. F.F. No. 26. IME Physician is a board certified podiatrist at the Foot and Ankle Center of Philadelphia. F.F. No. 22a.

As noted above, Hearing Officer rejected Provider's Physician's two reports as not credible or persuasive. F.F. No. 24. Hearing Officer observed that Provider's Physician's reports were not consistently based upon the evidence of record. F.F. No. 24a. For example, the reports misstated the mechanism of Claimant's injury as a tractor running over the right side of Claimant's body, as compared to his right foot. Id. Provider's Physician's reports also alleged that Claimant suffered a crush injury to the right side of his body, including the chest, abdomen, and pelvis without explaining why the corrective treatment Provider administered to Claimant on the date of injury consisted primarily of treatment for the right-foot injury, identified by EMS as Claimant's chief complaint. Id. Provider's Physician's reports also stated that Claimant's superior pubic ramus

9

fracture, detected on the CT scan, required long-term rehabilitation and pain management. Id. Hearing Officer noted that the record did not support that conclusion. Id.

Hearing Officer also agreed with Insurer's assessment that Provider's Physician's reports confirm that his focus was on things that could have possibly been wrong with Claimant once Provider performed further testing and evaluation. F.F. No. 24b. In other words, Provider's Physician's reports were based more on speculation and hypothetical problems than on the objective information available at the time of Claimant's initial assessment by the EMS and Provider's ER intake unit. Id.

Ultimately, Hearing Officer found that the evidence did not support a conclusion that EMS personnel transported Claimant to Provider because his injury had been deemed immediately life-threatening or urgent. F.F. No. 27. Therefore, Hearing Officer found that Claimant did not sustain an immediately life-threatening or urgent injury for purposes of the trauma center exemption under the Act. F.F. No. 28.

Consequently, Hearing Officer determined that Insurer proved by a preponderance of the evidence that Claimant did not sustain an immediately life-threatening or urgent injury on January 22, 2016, such that Provider should not be reimbursed beyond the $12,402.46 already tendered. Conclusion of Law No. 4. In short, Claimant's injury did not meet the criteria under the Triage Guidelines for transport to a trauma center at the time of Claimant's initial assessment.

10

Accordingly, Hearing Officer vacated the Bureau's fee review determination. In particular, Hearing Officer stated: "Provider is not entitled to reimbursement at 100% of usual and customary charges for the care provided Claimant on January 22 through January 24, 2016." Hr'g Officer's Order, 4/9/18. Provider petitions for review.[3]

## II. Discussion

## A. Argument

Provider contends Hearing Officer erred in vacating the Bureau's fee review decision and by determining that Provider's services were not trauma services for purposes of the trauma center exemption. Provider contends Hearing Officer's determination that the services at issue did not qualify as trauma is not supported by substantial evidence and does not comply with the Triage Guidelines for determining whether the services were trauma related.

More specifically, Provider asserts a determination of whether services qualify as trauma for purposes of the trauma center exemption from the Act's medical fee caps is controlled by Section 306(f.1) of the Act, 34 Pa. Code §127.128, and the Triage Guidelines. Section 306(f.1)(10) of the Act defines trauma as an "immediately life-threatening or urgent injury." 77 P.S. §531(10). Summarizing Section 127.128 of the MCC Regulations, Provider asserts that acute care provided in a trauma center is exempt from the Act's medical fee caps where: (a) the injury

---

[3] Our standard of review is limited to determining whether Hearing Officer's findings are supported by substantial evidence and whether Hearing Officer erred or violated a party's constitutional rights. Roman Catholic Diocese of Allentown v. Bureau of Workers' Comp., Fee Review Hearing Office (Lehigh Valley Health Network), 33 A.3d 691 (Pa. Cmwlth. 2011).

11

is an immediately life-threatening or urgent injury and services are provided in an accredited trauma center;[4] (b) the patient is transported to the trauma center in

[4] Section 127.128(a)-(d) of the MCC Regulations provides, in pertinent part:

(a) Acute care provided in a trauma center or a burn facility is exempt from the medical fee caps, and shall be paid based on 100% of usual and customary charges if the following apply:

(1) The patient has an immediately life-threatening injury or urgent injury.

(2) Services are provided in an acute care facility that is one of the following:

(i) A level I or level II trauma center, accredited by the Pennsylvania Trauma Systems Foundation ….

* * * *

(b) Basic or advanced life support services, as defined and licensed under the [EMS] Act, [Act of July 3, 1985, P.L. 164, as amended, 35 P.S. §§6921-6938] provided in the transport of patients to trauma centers or burn facilities under subsection (a) are also exempt from the medical fee caps, and shall be paid based on 100% of usual and customary charges.

(c) If the patient is initially transported to the trauma center or burn facility in accordance with the [Triage Guidelines], payment for transportation to the trauma center or burn facility, and payments for the full course of acute care services by all trauma center or burn facility personnel, and all individuals authorized to provide patient care in the trauma center or burn facility, shall be at the provider's usual and customary charge for the treatment and services rendered.

(d) The determination of whether a patient's initial and presenting condition meets the definition of a life-threatening or urgent injury shall be based upon the information available at the time of the initial assessment of the patient. A decision by ambulance personnel that an injury is life threatening or urgent shall be presumptive of the reasonableness and necessity of the transport to a trauma center

accordance with the Triage Guidelines; (c) the trauma determination is based on information available at the time of the initial assessment of the patient; and (d) trauma is presumed unless there is clear evidence of a violation of the Triage Guidelines.

Provider further asserts that Step Two of the Triage Guidelines mandates that if there is a pelvic fracture or crushed extremity, the patient must be taken to a trauma center. R.R. at 123a. Here, Provider argues, its Physician, who is board certified in critical care and serves as its Associate Director of Trauma, unequivocally reported that Claimant sustained a crush injury and a pelvic fracture when the tractor ran over the right side of his body.

Further, Step Three of the Triage Guidelines requires transport to a trauma center if the accident results from an automobile striking a pedestrian or bicyclist. Id. Here, a tractor ran over Claimant. Step Four defers to EMS provider judgment for trauma transport. Id. The EMS judgment call will be upheld unless there is a clear violation of the Triage Guidelines. Id.

Provider asserts Hearing Officer erred in finding that the tractor only ran over Claimant's right foot rather than the entire right side of his body. ER records confirm Claimant was tender over his ribs and had abrasions on his head, tenderness of his right pelvis, right groin, and a right-foot fracture. Although

---

or burn facility, unless there is clear evidence of violation of the [Triage Guidelines].

34 Pa. Code §127.128 (a)-(d) (citation omitted).

13

Hearing Officer is free to believe Insurer's Physician, Provider maintains there is no support for Insurer's Physician's assumption, or Hearing Officer's finding, that the tractor only ran over Claimant's right foot. A tractor running over Claimant's right foot would not cause abrasions to his head or tenderness of the right ribs and right pelvis. Therefore, Provider argues a crush injury, a pelvic fracture and the EMS judgment all warranted transport to a trauma center for Claimant's serious and life-threatening injuries.

Provider further asserts that the following notes in its ER and treatment records (as opposed to EMS records) contradict Hearing Officer's findings and conclusions: patient run over by tractor, R.R. at 174a (consultation); tractor ran over patient's right foot and knocked him to the ground; patient complaining of pain in his right foot, right side of the chest and right groin, R.R. at 176a (discharge summary); patient had leg and chest run over by tractor, R.R. at 178a (ER record); pedal pulse diminished in patient's right lower extremity, severe midfoot deformity with skin tenting, R.R. at 179a (ER record); when patient fell to the ground, tractor ran over the right side of his body, R.R. at 186a (trauma admission history), R.R. at 241a (trauma evaluation); when patient leaned over to start tractor, it leapt forward running over his right foot and right side of his body, R.R. at 244a (trauma evaluation).

Provider argues that none of the above seven notes in its ER and treatment records (as opposed to EMS records) supports Insurer's Physician's assumption that the tractor only ran over Claimant's right foot. Therefore, Provider continues, Insurer's Physician's opinion, and Hearing Officer's finding, is not based

on substantial competent evidence. As such, Provider alleges Hearing Officer clearly erred in finding and concluding that Provider's services did not qualify for payment under the trauma center exemption. Accordingly, Provider requests we vacate Hearing Officer's decision and remand for a reasoned decision based on the competent evidence of record.

### B. Analysis

In workers' compensation cases, matters of credibility and evidentiary weight are within the sole province of the fact-finder. Pittsburgh Mercy Health Sys. v. Bureau of Workers' Comp., Fee Review Hearing Office (U.S. Steel Corp.), 980 A.2d 181(Pa. Cmwlth. 2009). We will not reweigh the evidence or substitute our credibility determinations for those of the hearing officer. Id. Further, it is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made. See A & J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi), 78 A.3d 1233 (Pa. Cmwlth. 2013). Moreover, we must view the evidence in a light most favorable to the prevailing party and give it the benefit of all inferences reasonably deduced from the evidence. Id.

In a fee review proceeding, an employer or its insurer has the burden of proving by a preponderance of the evidence that it properly reimbursed a provider of medical services. 34 Pa. Code §127.259(f); Roman Catholic Diocese of Allentown v. Bureau of Workers' Comp., Fee Review Hearing Office (Lehigh Valley Health Network), 33 A.3d 691 (Pa. Cmwlth. 2011). A decision by EMS personnel that an injury is immediately life-threatening or urgent shall be

15

presumptive of the reasonableness and necessity of the transport to a trauma center. Roman Catholic Diocese. Significantly, "[t]he determination of whether a patient's initial and presenting condition meets the definition of an immediately life-threatening or urgent injury shall be based on the information available at the time of the initial assessment of the patient." 34 Pa. Code §127.128(d) (emphasis added).

## 1. Right Foot v. Right Side of Body

Here, the EMS records from the scene of the accident include the following assessment: "[Patient] stated he was standing next to his tractor when he started it not realizing it was in gear. The [patient] stated he was pushed to the ground by it and the tractor ran over his [right] foot. [Patient] denies head, neck or back pain also never had a [loss of consciousness]." R.R. at 31a. Claimant's admitting physician, Dr. Budier, stated in his discharge summary (with emphasis added):

> This is a 41-year[-]old male who was brought to [Provider] from the scene of an accident. The patient said he was standing next to a farm tractor and leaned over and started the ignition. At that point, the tractor leapt forward running over the patient's right foot and knocking him down to the ground. He was complaining of pain in his right foot, right side of the chest, and right groin.

R.R. at 176a.

Similarly, IME Physician's report includes the following history: "[Claimant] stated that on 1/22/16 while at work he went to start a tractor while standing next to it. He did not realize that it was in gear and he was pushed to the ground by the tractor and it ran over his right foot." R.R. at 24a (emphasis added).

16

At the hearing, Insurer's Physician testified (with emphasis added):

Q. When [Claimant] described the incident to both the ambulance personnel and later for his [IME], he stated that the tractor ran over his foot. Was there any indication in the medical records themselves, or in the history that he provided to any of his providers, that suggests that the tractor ran over the right side of his body?

A. No. <u>He seemed rather clear that the tractor ran over his foot</u>. Incidentally, upon a secondary survey in trauma where, after ensuring that the patient is stable, a more complete exam is performed, they mentioned an abrasion on his head that was non-tender. <u>But apparently to the examining physician then there were no external signs of trauma over the chest, over the abdomen, over the pelvis, over the leg</u>. There was the deformity of the foot, an abrasion of the head, and some tenderness or pain in the right arm. But according to the medical record, there was not a scratch on his body.

Q. If he ha[d] been run over by a tractor on the right side, would you have expected him to have other signs of injury on the right side of his body?

A. I would. <u>It seems to me that the injuries and physical findings are consistent with getting pushed over to the ground, perhaps landing on his side, maybe scraping, you know, on his forehead, but there was no evidence that he was actually run over, with the exception of his foot, by that tractor</u>.

Notes of Testimony (N.T.), 8/18/17, at 34-35; R.R. at 88a-89a.

Thus, competent medical evidence plainly supports Hearing Officer's finding that Claimant sustained a work injury when a tractor ran over his right foot. Claimant's injuries to the rest of the right side of his body are more consistent with being knocked to the ground on his right side than being run over by a farm tractor.

17

As noted above, any conflicts in the evidence were for Hearing Officer, as sole fact-finder, to resolve. Pittsburgh Mercy.

## 2. Crush Injury

With respect to the crush injury to the right foot alleged by Provider's Physician, Insurer's Physician stated in his report "[Claimant's] foot was not pulseless, crushed, degloved or mangled. Thus, according to the [Triage Guidelines], it was appropriate to transport him to the nearest medical facility." R.R. at 20a. In addition, IME Physician noted in his report that Claimant's right-foot injury showed no evidence of compartment syndrome or neurovascular structural damage. R.R. at 26a.

Consequently, Hearing Officer's rejection of Provider's Physician's testimony that Claimant suffered a crush injury is supported by substantial competent evidence. See F.F. No. 24a.

## 3. Pelvic Fracture

With respect to Claimant's superior pubic ramus fracture, diagnosed by a CT scan, EMS records stated: "Pelvis Findings: Stable to flex/compression." R.R. at 33a. Further, Insurer's Physician testified at the hearing that there was no indication in the record that anyone who treated Claimant in the field knew, was aware of, or even suspected Claimant had a pelvic fracture. N.T. at 50; R.R. at 104a. Claimant did not complain of pain in his abdomen or pelvis. Id. As such, EMS assessed the pelvis as stable. Id.

18

In addition, Hearing Officer correctly noted that Provider's Physician's testimony that Claimant's pelvic fracture required long-term rehabilitation or pain management was not supported by the record. To the contrary, Claimant's pelvic fracture did not require any surgical intervention or follow-up treatment. F.F. No. 14a. Insurer's Physician's testimony supports this finding. See N.T. at 29-30; R.R. at 83a-84a.

Therefore, Insurer's Physician's opinion (that Claimant's condition did not warrant trauma transport under Step Two of the Triage Guidelines) provided competent medical evidence supporting Hearing Officer's rejection of Provider's Physician's testimony (that Claimant's incidental pelvic injury warranted trauma transport under Step Two of the Triage Guidelines). Pittsburgh Mercy.

**4. EMS Judgment**

In Finding of Fact No. 27, Hearing Officer found that the evidence did not support a conclusion that EMS personnel transported Claimant to Provider, a trauma center, because they deemed his injuries life-threatening or urgent. This finding is supported by substantial evidence. EMS records indicate transport was accomplished with no lights or sirens. R.R. at 30a. EMS diagnosed Claimant's "Initial Patient Acuity" as "Lower Acuity (Green)." R.R. at 33a. Therefore, the record does not support Provider's contention that EMS personnel deemed Claimant's work injury to be immediately life-threatening or urgent for purposes of the trauma center exemption in Section 306(f.1) of the Act, 77 P.S. §531.

19

### III. Conclusion

Provider's arguments raise fairness and commonsense points. However, the points run counter to the policy judgments made by the General Assembly when it enacted the cost containment provisions of the Act, and the regulations promulgated pursuant to them. For the above reasons, we conclude that Hearing Officer's decision that Claimant's injuries were not immediately life-threatening or urgent, for purposes of the trauma center exemption from the medical fee caps, is supported by substantial evidence and is in accord with applicable law. Accordingly, we affirm Hearing Officer's order vacating the Bureau's fee review determination.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Crozer Chester Medical Center,     :
                                            Petitioner     :

                         :

                      v.              :    No. 648 C.D. 2018

                         :

Bureau of Workers' Compensation     :
Fee Review Hearing Office (Laundry     :
Owners' Mutual Liability Insurance),     :
                      Respondent     :

## O R D E R

**AND NOW**, this 3rd day of April, 2019, the order of the Bureau of Workers' Compensation Fee Review Hearing Office is **AFFIRMED**.

 

 

_____
ROBERT SIMPSON, Judge